# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MARKUS JOHNSON,

    Plaintiff,                        CASE NO. 07-CV-13190

-vs-                                        PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE

BEVERLY BISHOP, et al.,

    Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants' January 3, 2008 Motion to Dismiss, or in the Alternative, for Summary Judgment. (Doc. No. 6). *Pro se* Plaintiff Markus Johnson ("Plaintiff") filed a Response on January 30, 2008. The Court held a motion hearing on March 27, 2008. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendants' motion.

**I. BACKGROUND**

This case arises from Plaintiff's allegations that he was discriminated against on the basis on sex and disability while working as clerk for the United States Department of Housing and Urban Development ("HUD"). Construing Plaintiff's pleadings liberally, the Court assumes that Plaintiff is asserting causes of action under Title VII and the Rehabilitation Act.

Plaintiff began working for HUD on July 5, 1998, as a GS-01 through a worker trainee program. (Def. Br. Ex. B, 5/24/04 Johnson Decl. 1). Several years later, Plaintiff was promoted to GS-04. (*Id.*).

1

In July 2002, Plaintiff was detailed to HUD's Public Housing Division by Diane Johnson, the Detroit Office's Acting Field Director of Field Policy & Management. (*Id*.). Plaintiff remained at Public Housing until January 31, 2003. (*Id*.).

On June 7, 2003, Plaintiff alleged that he "discovered" that he was being discriminated against on the basis of his gender, since: (1) Johnson did not provide him with the proper documentation for his Public Housing assignment; and (2) his opinion was that the was performing the work of a "GS-07" and was not compensated accordingly. (*Id*. at 1-2).

On July 3, 2003, Plaintiff filed a Complaint of Discrimination with the Equal Opportunity Employment Division ("EEO") of HUD. (Def. Br. Ex. A, EEO Complaint). Plaintiff complained that Johnson discriminated against him on the basis of sex. (*Id*.). Plaintiff's allegations included that: (1) Johnson attempted to remove Plaintiff from "Public Housing" because she was upset that he had filed a complaint; (2) Plaintiff was not allowed to sit in Field Policy & Management ("FPM"), but was in the "Administration section for punishment"; (3) Johnson told Plaintiff that he did not belong in FPM because he was "incompetent, without proper Education, male with no skills, and no Future at HUD"; (4) Plaintiff was assigned to "Public Housing" for "a total of Three hundred days," without official employment documentation; (5) Plaintiff was instructed to read a book called "The Fish," quizzed on it, and then forced to read it out loud; and (6) Toni Schmiegelow told him that he needed to cut his hair, to shave, and to wear better clothes to work. (*Id*.).

In a May 5, 2004 sworn declaration to Mary Cartman, a contract investigator for HUD, Plaintiff further elaborated his allegations against Johnson:

> On a continuous basis, Ms. Johnson reminded me that I was "illiterate." She also reminded me constantly that I came to the department under the welfare-to-work

2

program and had she been there before my probationary period had ended, I never would have made it to GS-04 level because she would have fired me.
. . . .
Ms. Johnson clearly violated the union agreement with DHUD, which clearly speaks to details over 30 days, requiring "temporary" promotion to the position and details past 120 days invokes the upward mobility program.

Ms. Johnson did not compensate me at the level I was performing at the time I was detailed to PH performing GS-07 duties substantiated by the fact that the lowest position in PH is a GS-07 Program assistant.
. . . .
Retaliatory acts took many forms after I filed a grievance pertaining to the inequity in pay and violation of the [Equal Pay Act]. For example, there were three (3) positions which had become available – one GS-05 Program Assistant position, one Receptionist, and one Secretary's position. [I] recall having a one-on-one interview with Ms. Johnson where I observed Ms. Johnson "nodding" during the interview period. However, the interview covered my being accused of not knowing how to be interviewed; being told that African Americans do not look after each other like white people do; insulted (i.e., not right for the position; illiterate), and told she would not promote me to the position. I went to Les Berman, NFFE at the time and filed a grievance. Ms. Johnson's attitude about the union, particularly Les Berman, was one of monumental disrespect. Her attitude was one where indicative of no (sic) she had no one she had to answer to; she had "carte blanche" in whatever she decided to do; she was sent to clean up the office; and I was one of the people – worker trainees – who should have been terminated because I was "illiterate." I informed Beverly Bishop of his but nothing happened. I also recall Ms. Johnson "blowing kisses" at me. . . . I guess I was supposed to act upon this "unwelcome" behavior, which would give Ms. Johnson the precise ammunition she would need to justify my termination.
. . . .
Ms. Johnson terminated all the male employees except Robert Turner who retired. She was always very rude, condescending, belittling, demeaning, etc. to males in the office. She even told Mr. Berman he was "insignificant" and "useless" in my presence.

(*Id*. at 2-4).

Plaintiff's Declaration also included allegations against Schmiegelow, Johnson's replacement:

I remember after Ms. Schmieglow was given the position of Field Office Director, around August 2003[,] the abuse began again. It started when Ms. Schmieglow told me to read a book called "The Fish." I had no clue why this was necessary but I did

3

> as I was told. It took me a week to complete the book because I still had my regular job duties to perform. Ms. Schmieglow did not give me reading time on the job. Nevertheless, after I finished reading the book she quizzed me about the book – four questions sent to me via e-mail. No one else had been treated in this manner. After responding to the questions, I was then asked to report to her office and read aloud three (3) different paragraphs from the book. It finally came to me what was happening. I concluded she had been informed about the daily "badgering" and labeling of being "illiterate" made by Diane Johnson as the reason for not promoting me. As a result, I was required in Ms. Schmieglow's office two to three times per week; sometimes with a union representative and sometimes not. When the union representative was not present, Ms. Schmieglow had no problem in informing me how she really felt even to the point of telling me to cut my hair or that I needed to shave or my clothes was inappropriate for the workplace. For the record, there is no dress code to the best of my knowledge. Nevertheless, I dress appropriately. Next she informed me I was unprofessional and that my perception and personality was "all wrong" for DHUD which she called the three P's.
>
> Around September 2003, Ms. Schmieglow also informed me that she was "fed up" with me and the her Manager's goal for the year 2004 was to see me out the door.
>
> My two (2) to three (3) trips per week to Ms. Schmieglow's office continued during the month of October 2003. She also told me my voice was too loud for the office and my lack of professionalism the Three P's were the reasons she was going to have me terminate from DHUD. For the next month or so, the same daily verbal abuse continued.
> . . . .
> Around December 2003, I recollect an incident where Ms. Schmieglow "thumped" me on the head two (2) times while I was setting up the website and made an error with one of the letters of an e-mail address. She was at my back and I could not see her. I also recall an incident where I received the "brunt" of anger caused by Ms. Schmieglow offending CPD, unknown to me, when she moved furniture from CPD. I was an innocent victim who simply had been told to remove the files on the floor and I went to CPD to obtain some filing cabinets.
>
> Adding insult to injury, around January 2004 Ms. Schmieglow devised a cunning scheme – entrapment – where she told me in the presence of a union representative that I was going to get two (2) weeks off with no pay (LWOP) and that the potential for rehabilitation was doubtful. She also told me she felt "termination" was best.

(*Id*. at 5-7).

In March of 2005, Plaintiff and HUD entered into a settlement agreement resolving his EEO Complaint. (Def. Br. Ex. C, Settlement Agreement). The principal terms of the settlement

included: (1) Plaintiff withdrawing his EEO Complaint; (2) a payment to Plaintiff of $5,000; (3) Plaintiff's promotion to the position of Customer Service Representative at GS-05, with a potential to reach GS-06; and (4) a complete release of Plaintiff's claims that were brought or could have been brought by that time.

On May 2, 2005, Administrative Law Judge ("ALJ") Mimi M. Gendreau dismissed Plaintiff's pending case. (Def. Br. Ex. D, Order of Dismissal).

On September 27, 2005, Plaintiff filed another EEO Complaint – this time against Schmiegelow and Thomacina Brown, an Operations Specialist. Plaintiff included the following information on HUD's EEO Form pertaining to his claim:

> I am send (sic) a letter from the therapist that should give you some ideal what I have been thru for the last two year with Toni Schmiegelow and Thomacina.
> . . . .
> The only Action I am looking for is Removel from the supervision of Toni Schmiegelow and two hundred thousand dollars for over two years of treatment for being a male and working for HUD my only crime.

(Def. Br. Ex. E, Second EEO Complaint).

Plaintiff's counselor, Beverly J. Harris, wrote a letter accompanying the EEO Complaint, stating in relevant part:

> To cite a few of the infractions that [Plaintiff] is being charged with: talking too loud, tone of his voice, type of clothes worn, being asked to preform (sic) secretarial jobs that are normally the duties of the receptionist, being reprimanded if not looking at supervisor when she speaks to him, being asked to stay within the supervisor's eye sight at all times, and not being able to leave the room without her permission. . . . [Plaintiff] is a fine young man who processes a good work ethnic (sic) and integrity, and certainly should not be subjected to the daily treatment that he is forced to endure each day.

(*Id.*).

On November 10, 2005, John W. Burden, HUD's EEO Director, sent a letter to Plaintiff confirming the following claim to be investigated:

> Whether you were discriminated against based on your sex (male), disability (depression), and in reprisal for previous EEO activity when, for the past three years, you have been subjected to continuous harassment by your supervisor, the Detroit Field Office Director. You site (sic) being referred to the Employee Assistance Program (EAP) for the second time as an example of the harassment. You learned of the referral on July 22, 2005.

(Def. Br. Ex. F, 11/10/05 HUD EEO Letter).

On February 9, 2006, the EEO completed its investigation and issued an investigation report. (Def. Br. Ex. G, EEO Investigation Report).

The case then proceeded to a hearing before ALJ Christine A. Dribble. HUD filed a motion to dismiss, or in the alternative, for summary judgment. (Def. Br. Ex. I, Motion to Dismiss). In that pleading, HUD contended that: (1) Plaintiff's allegations involving harassment involved "legitimate, reasonable, and non-discriminatory efforts by management to correct Complainant's pattern of disruptive and unprofessional behavior in the workplace"; (2) Plaintiff failed to demonstrate that he suffered a harm of loss with respect to a term or condition of his employment; and (3) Plaintiff failed to make a prima facie case of discrimination by failing to show that he was treated differently than similarly-situated members of his protected class. (*Id.*).

On September 9, 2006, the ALJ entered a decision in favor of Defendant. (Def. Br. Ex. J, ALJ Decision). In a written opinion, the ALJ concluded that: (1) Plaintiff did not have a qualifying disability for a Rehabilitation Act claim; (2) Plaintiff failed to establish a workplace that was "hostile and abusive in violation of Title VII."

On October 13, 2006, HUD adopted the ALJ's decision as its final order. (Def. Br. Ex. K, HUD Final Order). Plaintiff appealed HUD's final order on November 16, 2006.

On May 2, 2007, the EEOC affirmed HUD's decision. (Def. Br. Ex. L, EEOC Decision).

On June 31, 2007, Plaintiff filed a five-page, single-spaced Complaint in this Court in the form of a letter against HUD and its various employees, with approximately 250 pages of documents as "exhibits." Construing the pleadings liberally, Plaintiff appears to plead hostile work environment, sex discrimination, and retaliation claims, involving HUD employees Johnson, Schmiegelow, Brown, and Gloria Smart.

Plaintiff makes the following claims against Johnson:

(1) Johnson attempted to massage his shoulders while he was cleaning up an area in FPM;

(2) Johnson removed Plaintiff from PH and sent him back to Administrative because she did not like the fact that Plaintiff asked to be paid at a higher grade for the work he was performing;

(3) Johnson stated that there was no place for an "illiterate" person like Plaintiff at HUD; and

(4) At an interview for a Program Assistant job at FPM, Johnson told him that he did not have what it took for the job and explained how white people help each other out.

Plaintiff makes the following claims about Schmiegelow, who replaced Brown in 2003, and acted as his first-line supervisor from mid-June 2003 until October 2005:

(1) Schmiegelow made Plaintiff read a book called "The Fish" to confirm whether he was "illiterate";

(2) Schmiegelow made comments about Plaintiff's hair and clothes about two or three times a week, and suggested that he shop at "goodwill" for better clothes;

(3) Schmiegelow put two people on Plaintiff to make him quit;

(4) Schmiegelow made it "open season" for any female who had a problem with Plaintiff to come to her so that she could reprimand him; and

7

(5) Schmiegelow used Brown as a tool to harass him.

Plaintiff also brings claims against Gloria Smart, an IT employee, for an incident that occurred in May 2006. On May 10, 2006, Plaintiff contends that Smart called him a "small-brained ignorant nigger" in Yvonne Poindexter's office. Plaintiff claims that to "cover up" this statement, Smart and Poindexter fabricated harassment allegations against him, claiming that he called Smart "bitch" twice on May 12, 2006, was being disruptive in the workplace, and was harassing female employees. Plaintiff further maintains that he was unfairly investigated and disciplined, and subsequently suspended for two weeks without pay.

On January 3, 2008, Defendants brought a motion to dismiss, or alternatively, for summary judgment. Defendants contend: (1) Plaintiff's Complaint names several improper defendants; (2) Plaintiff's claims based upon alleged pre-spring 2005 conduct are barred due to a valid settlement agreement and release; (3) a portion of Plaintiff's claims were not administratively exhausted; (4) Plaintiff cannot show the "causation" prong of a prima facie case of discrimination; (5) Plaintiff's hostile work environment claim fails because he has failed to show that the harassment was sufficiently severe or pervasive; (6) Plaintiff's Rehabilitation Act claim fails because he does not have a qualifying disability; and (7) Plaintiff's claim regarding the EAP should be dismissed for not qualifying as an "adverse employment action."

## II.  ANALYSIS

### A.  Standard for Summary Judgment

The United States Court of Appeals for the Sixth Circuit has summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B. Improperly-Named Defendants

Defendants contend that under the relevant federal statutes, Plaintiff can only bring his claims against the head of the federal agency in question, and not individual HUD employees. Defendants maintain that all named Defendants, save Alphonso Jackson, the Secretary of HUD, should be dismissed.

Section 2000e-16(c) of 42 United States Code states:

> Within 90 days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Equal Employment Opportunity Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e-5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

9

Similarly, the Rehabilitation Act incorporates the procedural requirements of Title VII:

> The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e-5(f) through (k)), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

29 U.S.C. § 794a(1).

The Sixth Circuit has recognized that the only proper defendant in a Title VII case involving a federal governmental agency is a head of the department, agency, or unit. *Hancock v. Egger*, 848 F.2d 87, 89 (6th Cir. 1988) ("Adherence to [Title VII's] requirements is mandatory, and we are neither authorized nor inclined to ignore its mandate"); *Mulhall v. Ashcroft*, 287 F.3d 543, 550 (6th Cir. 2002).

Therefore, the Court DISMISSES the following named Defendants: Beverly E. Bishop, Joseph P. Galvin, Thomacina Brown, Yvonne Poindexter, Gloria Smart, Sheila Walker, Diane Johnson, Toni Schmiegelow, and HUD.

    **C.**    **Settlement Agreement and Pre-2005 Claims**

Defendants argue that Plaintiff's April 25, 2005 settlement agreement precludes him from asserting claims of discrimination that he raised, or could have raised, at that time. Defendants contend that the following allegations in the Complaint are barred by operation of the settlement and release: (1) claims that Johnson made statements about Plaintiff's intelligence

and suitability for his position at HUD; (2) claims that Schmiegelow forced him to read out loud a book called "The Fish," and made Plaintiff answer questions about it; and (3) claims that Schmiegelow dressed down Plaintiff about his hair and work attire. Defendants maintain that the settlement and release further prevents Plaintiff from raising any claims that he could have at that time.

> The relevant portion of the settlement agreement states:
>
> The Complainant agrees to forever release and waive his right to file any complaint, claim, lawsuit, grievance, or appeal against the Department, its officials, employees, former officials or former employees, or their successors and assignees, including any and all claims against Department officials, employees, or former officials or employees, in both individual and official capacities, in any state or Federal court, or before any administrative body, tribunal, board or commission, regarding any matter that was or could have been raised in connection with the above-captioned matter.

(Settlement Agreement at 2).

> Federal common law controls the validity of a release of a federal cause of action. For discrimination cases, the Sixth Circuit uses a balancing test to determine whether a settlement agreement was entered into knowingly and voluntarily. We consider the following factors: (1) [a party's] experience, background, and education; (2) the amount of time [the party] had to consider the release, including whether he had the opportunity to consult with a lawyer; (3) the clarity of the release; (4) the consideration for the release; and (5) the totality of the circumstances.

*Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir. 2003) (internal citations omitted).

Plaintiff makes no argument why any of the factors weigh in his favor. Additionally, Plaintiff did have a representative, Charles R. Cutting, review the settlement agreement.

Thus, the Court GRANTS summary judgment to Defendants on Plaintiff's allegations of discrimination encompassed by the settlement and release.

### D.  Exhaustion of Administrative Remedies

Defendants contend that Plaintiff has not exhausted his administrative remedies for certain post-settlement agreement claims. On September 27, 2005, Plaintiff filed a second EEO Complaint of Discrimination at HUD. Plaintiff brought his complaint against Schmiegelow and Brown. Plaintiff included the following information on HUD's EEO Form pertaining to his claim:

> HUD'S EEO informed Plaintiff that it would investigate the following claims:
>
> Whether you were discriminated against based on your sex (male), disability (depression), and in reprisal for previous EEO activity when, for the past three years, you have been subjected to continuous harassment by your supervisor, the Detroit Field Office Director. You site (sic) being referred to the Employee Assistance Program (EAP) for the second time as an example of the harassment. You learned of the referral on July 22, 2005.

"Although trial courts are to interpret EEO complaints liberally . . . . to encompass all claims reasonably expected to grow out of the charge of discrimination, this does not mean . . . . that plaintiffs are excused from filing charges on a particular discrimination claim before suing in federal court." *Johnson v. Rumsfeld*, 238 F. App'x 105, 108 (6th Cir. June 29, 2007) (unpublished) (internal citations and quotations omitted).

Despite this liberal standard, the Court finds that Plaintiff has failed to exhaust his internal EEO remedies on his claims against Smart. By his own admission, conduct involving Smart did not occur until May 2006, well after HUD's EEO completed its investigation of Plaintiff's internal complaint in February 2006. Therefore, since Plaintiff did not administratively exhaust his claims involving Smart and Poindexter for the purposes of the instant case, the Court DISMISSES WITHOUT PREJUDICE those claims.

The allegations involving Schmiegelow and Brown have been administratively exhausted and are properly before this Court.

### E. Discrimination & Hostile Work Environment Claims

Defendants contend that there is no genuine issue of material fact on whether: (1) any action was taken against Plaintiff because of his protected status; and (2) Plaintiff's working conditions were not sufficiently severe or hostile to support a potential hostile work environment claim.

To establish a race discrimination claim under Title VII, Plaintiff first must establish a prima facie case. This involves making the following showing: (1) that she is a member of a protected group; (2) that she was subjected to an adverse employment decision; (3) that she was qualified for the position; and (4) that she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007) (citation omitted).

If Plaintiff establishes a prima facie case, then the burden shifts to Defendant to articulate legitimate, non-discriminatory reasons for the adverse employment decision. However, Plaintiff "can establish pretext by demonstrating that the defendant's articulated legitimate, nondiscriminatory reason either: (1) lacks a basis in fact, (2) did not actually motivate her discharge, or (3) was insufficient to motivate her discharge." *Id.* at 497.

For the purposes of a hostile work environment claim under Title VII, the fourth prong of the prima facie case is substituted by the following:

> [T]he plaintiff must present evidence showing that under the "totality of the circumstances" the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." The severe or pervasive requirement has both an objective and a subjective component. It requires the court to examine, under the totality of the circumstances, "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance."

*Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (internal citations omitted).

Plaintiff alleges the following to support his discrimination and/or hostile work environment claims that: (1) Schmiegelow made comments about Plaintiff's hair and clothes about two or three times a week, and suggested that he shop at "goodwill"; (2) Schmiegelow put two people on Plaintiff to make him quit; (3) Schmiegelow made it "open season" for any female who had a problem with Plaintiff to come to her so that she could reprimand him; and (4) Schmiegelow used Brown as a tool to harass him.

The Court does not find that the record supports a reasonable inference that he was discriminated against, nor subjected to a hostile work environment, on account of his sex.

Although a district court owes no deference to the factual findings and legal conclusions of an EEOC ALJ, *Chandler v. Roudebush*, 425 U.S. 840, 863 (1976), the Court finds that the ALJ adequately summarized the evidence in the administrative record pertaining to Plaintiff's September 2005 EEO Complaint:

> The Complainant lists numerous incidents, none of which rise to the level of severity or pervasiveness required for proving harassment in violation of Title VII. These incidents consisted of: Schmiegelow referring him to the Employee Assistance Program ("EAP") on two occasions, suggesting that he improve his wardrobe, requiring him to get her permission to be away from his work desk, informing him he was "steps" from being terminated, repeatedly counseling him on the volume and tone of his voice, assigning him clerical duties, and issuing him a reprimand and admonishment for his treatment of a co-worker (Brown).
>
> There is no evidence that the Complainant was harmed by being referred to EAP. The referral made clear that his participation was voluntary and that he could not be "forced, threatened or coerced into accepting any form of counseling or treatment." Even assuming as true Schmiegelow told the Complainant that he should dress more professionally in the workplace, this does not even rise to the level of the trivial and inconsequential. Furthermore, his contention that Brown, a co-worker who occasionally served as Acting Field Office Director, was used by Schmiegelow as a tool to harass him is conclusory and lacks substantive supporting evidence. He detailed numerous incidents of Brown's "harassment" ranging from laughing in his

14

face, telling him how to perform his job to her complaining to management that she was mistreated by him. Likewise, there are numerous incidents of Brown complaining to management that the Complainant was harassing her. It is clear from the evidence that Brown and the Complainant were involved in a childish, immature and unprofessional personality dispute that did not in any way involve prohibited bases. Unfortunately, Schmiegelow lacked the necessary managerial skills to diffuse the conflict. Therefore, both employees continued to engage in petty acts against each other which made for an uncomfortable working environment for both. Two of the female employees under Schmiegelow's supervision, Hattie Meyers and Ann Ogletree, also complaints that she "harassed" them on impermissible bases. This is anecdotal evidence that Schmiegelow may have lacked good supervisory skills, however, there is not a scintilla of evidence that Brown's actions were being directed or encouraged by Schmiegelow as a means of harassing the Complainant because of his sex and, or protected activity.

Likewise, there is no evidence that he was repeatedly counseled about the tone of his voice because of his sex or protected activity. The Complainant and other witnesses admitted that his voice carried loudly. There were also documented incidents of him raising his voice in anger or frustration towards other employees. Second, a review of the Complainant's position description does not support finding that Schmiegelow assigned him clerical duties that were outside duties outlined in his job description.

Schmiegelow noted that she observed a pattern of the Complainant being away from (sic) extended periods so she spoke with his (sic) about it. She stated that she informed him it was important for her as his supervisor to know his whereabouts. There is no credible evidence to refute her on this point. Last, the Complainant failed to provide any substantive testimony or other evidence establishing a causal nexus between his prior protected activity and the alleged acts of harassment which occurred between June 2003 and December 2005.

(ALJ Decision 12-14) (internal citations and footnote omitted).

The Court finds that Plaintiff has failed to establish any evidence that the actions of Schmiegelow and Brown amounted to discrimination against him on the basis of his sex. Therefore, the Court GRANTS summary judgment to Defendants on Plaintiff's discrimination claims.

### G. Rehabilitation Act Claim

Defendants contend that Plaintiff cannot maintain a Rehabilitation Act claim because he is not a "qualified person with a disability."

The Sixth Circuit has summarized the legal analysis for a claim under the Rehabilitation Act:

> To bring a claim under the Act, [a plaintiff] must prove that (1) he is an individual with a disability, (2) he is "otherwise qualified" to participate in the activity in question, (3) he "is being excluded from participation in, being denied the benefits of, or being subjected to discrimination . . . . solely by reason of his" disability; and (4) the program allegedly discriminating against him receives federal funding.
>
> An "individual with a disability," the Act says, includes "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." "Because the standards" for establishing a claim under the Rehabilitation Act and the Americans with Disabilities Act, including the definition of disability, "are largely the same, cases construing one statute are instructive in construing the other."

*Greathouse v. Westfall*, 212 F. App'x 379, 382 (6th Cir. Nov. 7, 2006) (unpublished) (internal citations omitted).

Plaintiff's claimed disability is "depression" – serious cases of which can be a qualifying disability under the act. *See Swanson v. University of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001). However, Plaintiff has not shown that his depression limits any of his major life activities. Moreover, Plaintiff has provided no medical or psychological records substantiating the effects of his depression on his major life activities.

Therefore, the Court GRANTS summary judgment to Defendants on Plaintiff's Rehabilitation Act claim.

### III. CONCLUSION

Accordingly, the Court hereby:

(1) **GRANTS** Defendant's Motion to Dismiss, or in the alternative, Motion for Summary Judgment; and

(2) **DISMISSES WITHOUT PREJUDICE** Plaintiff's 2006 claims. Plaintiff must first administratively exhaust these claims before bringing them in this Court.

**SO ORDERED.**

                                    s/Paul D. Borman  
                                    PAUL D. BORMAN  
                                    UNITED STATES DISTRICT JUDGE

Dated: April 16, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 16, 2008.

                                    s/Denise Goodine  
                                    Case Manager